1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                  CENTRAL DISTRICT OF CALIFORNIA
10
11  RAYMOND G. LEE,                    )    NO. EDCV 04-753-MAN
                                       )
12              Plaintiff,             )
         v.                            )    MEMORANDUM OPINION AND ORDER
13                                     )
                                       )
14  JO ANNE B. BARNHART,               )
    Commissioner of the               )
15  Social Security Administration,    )
                                       )
16              Defendant.             )
    _____)
17

18       Plaintiff filed a Complaint on June 30, 2004, seeking review of the
19  denial  by  the  Social  Security  Commissioner  ("Commissioner")  of
20  Plaintiff's claim for supplemental security income benefits ("SSI").  On
21  August 25, 2004, the parties filed a "Consent to Proceed Before a United
22  States  Magistrate  Judge,"  pursuant  to  28  U.S.C.  §  636.   The  parties
23  filed a Joint Stipulation on April 27, 2005, in which:  Plaintiff seeks
24  an  order  reversing  the  Commissioner's  decision  denying  benefits  and
25  directing  the  payment  of  benefits  or,  alternatively,  remanding  the  case
26  for  a  new  hearing;  and  Defendant  requests  that  the  Commissioner's
27  decision  be  affirmed.    The  Court  has  taken  the  parties'  Joint
28  Stipulation  under  submission  without  oral  argument.

### SUMMARY OF ADMINISTRATIVE PROCEEDINGS

Plaintiff filed his application for SSI on February 21, 2002. (Administrative Record ("A.R.") 146-48.) Plaintiff claims to have been disabled since January 31, 2001, due to hearing loss, vision loss in one eye, and mood swings. (A.R. 12, 146.) He has past relevant work experience as a cook, cleaner, apprentice mill operator, and machine operator trainee. (A.R. 12.)

The Commissioner denied Plaintiff's claim for benefits initially and upon reconsideration. On January 15, 2004, Plaintiff, who was represented by counsel, appeared personally and testified at a hearing before Administrative Law Judge Mason D. Harrell ("ALJ"). (A.R. 163-212.) On February 4, 2004, the ALJ denied Plaintiff's claim for benefits, and the Appeals Council subsequently affirmed the ALJ's decision. (A.R. 11-18, 4-6.)

### SUMMARY OF ADMINISTRATIVE DECISION

In his February 4, 2004 decision, the ALJ found that Plaintiff has not engaged in substantial gainful activity since his alleged onset of disability. (A.R. 17.) The ALJ found that Plaintiff has "severe" impairments, consisting of bilateral tympanosclerosis, bilateral sensori-neural hearing loss, personality disorder, not otherwise specified, anxiety disorder, not otherwise specified, and low average intellectual functioning, but concluded that Plaintiff does not have an impairment or combination of impairments listed in, or medically equivalent to an impairment listed in, Appendix 1, Subpart P, Regulation

No. 4.  (A.R. 18.)  The ALJ found Plaintiff's subjective complaints to be not credible.  (*Id*.)  The ALJ found that Plaintiff had the following residual functional capacity assessment:

> [Plaintiff can] understand, remember and carry out moderately complex, four to five step instructions, constantly in a habituated, object oriented [environment] where his sensory limits are accommodated, there is no significant interpersonal interaction, only occasional changes in work routines and no need for hypervigilance or responsibility for the safety of others.  He needs to wear a hearing aid[] and have other[s] speak louder than normal.  He cannot communicate constantly. He cannot perform tasks requiring binocular vision.

(*Id*.)  The ALJ further found that Plaintiff could perform his past relevant work as a milling machine tender and cleaner.  (*Id*.) Accordingly, the ALJ concluded that Plaintiff was not "disabled." (*Id*.)

## STANDARD OF REVIEW

This Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).  The Commissioner's decision must stand if it is supported by substantial evidence and applies the appropriate legal standards.  Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  Substantial evidence is "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the

3

conclusion." <u>Moncada v. Chater</u>, 60 F.3d 521, 523 (9th Cir. 1995).

Although this Court cannot substitute its discretion for that of the Commissioner, this Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." <u>Desrosiers v. Secretary of Health and Human Serv.</u>, 846 F.2d 573, 576 (9th Cir. 1988); *see also* <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039-40 (9th Cir. 1995). This Court must uphold the Commissioner's decision if it is supported by substantial evidence and free from legal error, even when the record reasonably supports more than one rational interpretation of the evidence. *Id.* at 1041; *see also* <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 599 (9th Cir. 1999); <u>Flaten v. Secretary</u>, 44 F.3d 1453, 1457 (9th Cir. 1995).

**DISCUSSION**

Plaintiff alleges two disputed issues. <u>First</u>, Plaintiff contends that the ALJ improperly rejected the testimony of Jackie Longmire, his mother. <u>Second</u>, Plaintiff contends that the ALJ failed to develop the record adequately. (Joint Stip. at 3.)

///
///
///
///

4

1   **A.    The ALJ Failed To Provide Specific And Germane Reasons For**
2           **Rejecting The Testimony Of Plaintiff's Mother**.

3

4           "Lay testimony as to a claimant's *symptoms* is competent evidence
5   that an ALJ *must* take into account, unless he or she expressly
6   determines to disregard such testimony and *gives reasons germane to each*
7   *witness for doing so.*" <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir.
8   2001)(emphasis added).  *See also* <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467
9   (9th Cir. 1996); <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993).
10  An ALJ may "properly discount lay testimony that conflict[s] with the
11  available medical evidence" (<u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395
12  (9th Cir. 1984)), particularly, where, as in <u>Vincent</u>, "lay witnesses
13  [are] making medical *diagnoses*," as "[s]uch medical diagnoses are beyond
14  the competence of lay witnesses and therefore do not constitute
15  competent evidence." <u>Nguyen</u>, 100 F.3d at 1467 (original emphasis).
16  When, however, a lay witness testifies about a claimant's *symptoms*,
17  which may affect the claimant's ability to work, such testimony *is*
18  competent evidence and therefore *cannot* be disregarded without comment.
19  *Id*.

20

21          In <u>Dodrill</u>, the Ninth Circuit explained the importance of lay
22  testimony and why it must be considered in determining a claimant's
23  disability:

24

25          Although eyewitnesses have to rely to some extent on
26          communications with the claimant in ascertaining whether she
27          is disabled or malingering, we have held that friends and
28          family members in a position to observe a claimant's symptoms

5

and daily activities are competent to testify as to her condition. *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). "Disregard of this evidence violates the Secretary's regulation that he will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." 20 C.F.R. § 404.1513(e)(2). *Id.*

That the ALJ dismissed all the lay witness testimony solely because he found that the claimant was not credible suggests he may have been under the mistaken impression that lay witnesses can never make independent observations of the claimant's pain and other symptoms. . . . [That] is not the case. An eyewitness can often tell whether someone is suffering or merely malingering. While this is particularly true of witnesses who view the claimant on a daily basis, the testimony of those who see the claimant less often still carries some weight.

12 F.3d at 919.

In rejecting the testimony given by Ms. Longmire, Plaintiff's mother, regarding the symptoms of his mental impairment, the ALJ stated:

[Plaintiff's] mother testified, she did not live with [Plaintiff] and had not lived with [Plaintiff] for some time except for a six to seven month period two years ago. She described her contact with [Plaintiff] as consisting of telephone conversations and e-mail messages. She said that

[Plaintiff's] mental problems involved sleeping all day, not responding to letters, ignoring bills, and severe mood swings, saying that he would be happy one minute[] and violent the next.  She emphasized that he had tried to kill her by choking her while she was caring for his father and that when he would get a job he would last only hours or a day, that he could not handle any stress, and that he had high levels of anxiety. She said that [Plaintiff's] father had made sure [Plaintiff] got up and got to work and talked to his employers to help [Plaintiff].  She stressed that [Plaintiff] did not function well at work, could not get along with others on a job, and could not handle the stress of changing duties at work.

[Plaintiff's] mother also emphasized that she had made appointments for [Plaintiff] to get psychiatric help, but he would not go to them and that she had taken [Plaintiff] to three appointments with the Department of Rehabilitation, but he would not go again.

[Plaintiff] mother also testified that [Plaintiff] was living with his sister, who is age 37, but was going to move and that when [Plaintiff] had tried to live alone, they had found him sitting in his room alone.  She admitted that he did drive, but said that he did not go to church regularly, about once a month, with long periods of nonattendance.  She also said that he had no friends and that he talked critically of others.

*     *     *

7

1       [Plaintiff] denies that he has any serious mental problems and

2       even though such statements should not be taken at face value

3       given the allegations of his mother, the evidence of record at

4       most establishes a problem of only mild to moderate severity

5       as noted herein.   Indeed, it is one closely related to

6       [Plaintiff's] motivation to see and obtain work that he can

7       perform and has performed in the past.   The evidence shows

8       that [Plaintiff's] motivation has been limited since he owns

9       a residence and is otherwise supported by his family.   *I*

10      *cannot wholly credit the testimony of [Plaintiff] or his*

11      *mother under such circumstances especially since the mother is*

12      *a layperson whose opinion regarding [Plaintiff's] emotional*

13      *problems can be given little weight.*

15 (A.R. 15-16; emphasis added.)

17       Plaintiff contends that the ALJ improperly rejected the testimony

18 provided by his mother.   Specifically, Plaintiff contends that the ALJ

19 inappropriately rejected the testimony of Plaintiff's mother because she

20 is a "layperson." (Joint Stip. at 3-4.)   Rejecting Ms. Longmire's

21 observations regarding the *symptoms* of Plaintiff's mental impairment,

22 because she is a lay witness, contradicts the law that the ALJ <u>must</u>

23 consider lay witness testimony.   <u>Lewis</u>, 236 F.3d at 511; <u>Dodrill</u>, 12

24 F.3d at 919.

26       Many of Ms. Longmire's observations, *viz.*, regarding Plaintiff's

27 violent outbursts, antisocial behavior, and inability to care for

28 himself and interact with others, suggest that Plaintiff has a much more

restricted mental residual functional capacity assessment than the ALJ found.  Evidence from examining physicians, such as Dr. Robert Dobrin's SPECT studies showing that Plaintiff has abnormal brain functioning (A.R. 107-08), Dr. Stuart Courtney's Global Assessment of Functioning ("GAF") of 45 (A.R. 127), and Dr. Jian Zhang's GAF of 35 (A.R. 131), provide objective support for Ms. Longmire's observations and suggest that Plaintiff's symptomatic behavior does not result from mere motivational difficulties alone.[1]  Although the ALJ gave significant weight to Plaintiff's assertion that he has no mental impairment, Plaintiff himself conceded that he had tried to kill his mother after he apparently "snapped." (A.R. 197 -- Plaintiff testified that "I almost killed her one time" and further explained that, "well, she made me angry for some reason.  Sometimes I remember that the reason why I'm angry and then maybe a month later I forget about it, it all disappear[s] out of my mind.  I don't know why.  And sometimes she makes me angry for some reason and then all of a sudden I get mad and I walk away from it.")  Regardless, Plaintiff's reluctance to admit and seek treatment for his mental health problems should not be dispositive of the existence and extent of his mental limitations. *See*, *e.g.*, <u>Nguyen</u>, 100 F.3d at 1465 ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation"; citation omitted).

Defendant contends that the ALJ properly rejected Ms. Longmire's testimony because she does not live with Plaintiff or see him sufficiently frequently to qualify as a "competent" witness.  Although

---

[1]   The findings and conclusions of these examining physicians are discussed further, *infra*, in Section B.

9

Ms. Longmire does not currently live with Plaintiff, she lived with him for approximately six months in 2002 (during which time Plaintiff tried to kill her) and she now corresponds with him mostly via e-mail (due to Plaintiff's hearing loss) about three times per week. (A.R. 171-72.) Plaintiff now lives with his sister. (A.R. 181.) According to his mother, Plaintiff has no friends and has never had a girlfriend (A.R. 180-81); similarly, Dr. Courtney noted that Plaintiff reported that "he has no friends [and] he does not enjoy spending time with others" and "all of the friends he has had are dead or living out of the state" (A.R. 125). Especially given Plaintiff's limited social circle, Defendant's contention that Ms. Longmire is not a "competent" lay witness, merely because she does not live with Plaintiff, is unfounded.

Accordingly, on remand, the ALJ must provide specific and germane reasons, if they exist, for rejecting Ms. Longmire's testimony regarding Plaintiff's mental limitations.

**B.    The ALJ Erred In Not Seeking Records Regarding Plaintiff's Mental Health Treatment.**

The Commissioner has an affirmative duty to develop the record, even if the claimant is represented by counsel. Brown v. Heckler, 713 F.2d 441, 442-43 (9th Cir. 1993); 20 C.F.R. §§ 404.1512(e), 416.912(e) (Commissioner must re-contact the treating physician or medical source to incorporate any missing records into the claim file if that physician's records are incomplete); see also, e.g., 20 C.F.R. §§ 404.1519a(b), 416.919a(b) (listing situations requiring a consultative examination, such as a conflict, inconsistency, ambiguity or

10

insufficiency in the evidence); 20 C.F.R. §§ 404.1517, 416.917 (when a claimant's medical sources do not give sufficient medical evidence about an impairment in order to determine whether the claimant is disabled, a consultative examination may be ordered).

Plaintiff contends that the ALJ improperly failed to develop the record, because he failed to seek the records from Plaintiff's treating mental health professionals that were identified in the testimony of Ms. Longmire, Plaintiff's mother.  (Joint Stip. at 6-7.)  These potential additional treatment records were identified when Dr. Joseph Malanchavuril, a non-examining medical expert and psychologist, questioned Ms. Longmire regarding Plaintiff's psychiatric treatment, as follows:

ME: . . . How come he has not gotten any psychiatric help?

WTN: I've made appointments for him but he won't -- if he shows up once he will not show up again.

ME: What type of appointments have you made.

WTN: We're trying to find him appointments that we could afford or that he could afford where he could go.  Right now I can't tell you what they are. . . .

ME: Did you go to a psychiatrist or a psychologist --

WTN: *Yeah, he went to a psychiatrist --*

1    ME: -- or a personal --

2

3    WTN: It was a county person.

4

5    ME: Are they specialized in dealing with his handicaps?

6

7    WNT: *Psychiatrist*.

8

9    ME: It's very clear from his statement he doesn't believe he's

10   psychiatrically ill.

11

12   WTN: I know that.

13

14   ME: And so sending him to a psychiatrist is rather different

15   than  sending  him  to  a  person  who  acknowledges  his

16   difficulties, people are picking on him and persecuting him

17   for his handicaps and has there been any help to --

18

19   WTN: I got him with the rehab person, Wendy, in San Bernardino

20   County.   We happen[ed]  to  be  in  town  and  some  of  the

21   appointments  came  up  and  we  took  him  to  the  first  two  or

22   three, I think it was the first three appointments and then he

23   never went back again.

24

25   ME: Why not?

26

27   WTN: Just personal -- I don't know, just mental behavior, he

28   wouldn't go again.

                                12

1  (A.R. 175-76; emphasis added.)

3       Defendant maintains that this testimony shows that Plaintiff never
4  went to a psychiatrist more than once, and therefore, any psychiatrist
5  who saw Plaintiff would not be a "treating" source.   Nonetheless, the
6  testimony of Plaintiff's mother indicates that mental health treatment
7  was sought for Plaintiff, and may have been received by him, at a San
8  Bernardino County facility ("San Bernardino County").   Unfortunately,
9  neither Dr. Malanchavuril nor the ALJ questioned Plaintiff's mother as
10  to specific details about Plaintiff's mental health treatment at San
11  Bernardino County.[2]   In any event, records of any mental health
12  professional who treated Plaintiff at San Bernardino County, even if
13  only on one occasion, bear directly upon the state of Plaintiff's mental
14  health and his mental limitations.[3]

16       Furthermore, the evidence in the record regarding Plaintiff's
17  mental limitations varies significantly.   In a November 21, 2002
18  Psychiatric Review Technique form, Dr. Michael Skopec, a state agency

20       [2]   Plaintiff's testimony sheds no light on the details of his
psychiatric treatment.   When questioned by Dr. Malanchavuril as to
21  whether he went to a psychiatrist or counselor, Plaintiff testified
that:  "My mother thought I had a mental problem, figured something was
22  wrong with me[.] . . . Because a lot of people looked at my handicap on
the outside say that it's like -- because people like when you work
23  differently they, look at this guy he's -- they looked at it that way."
(A.R. 183-84.)

25       [3]   Defendant further maintains that "Wendy," the woman referred
to in the testimony of Plaintiff's mother, necessarily refers to Wendy
26  Montagne, a rehabilitation specialist, who did not provide any mental
health services.   Although Defendant maintains that Montange provided
27  vision and hearing services tests only, Plaintiff's April 10, 2002
Disability Report shows that Montange provided "orientation." (Joint
28  Stip. at 7; A.R. 83.)   Thus, it is not clear whether she treated
Plaintiff in any way in connection with mental health issues.

13

1  physician, found that Plaintiff has no "severe" mental impairment.
2  (A.R. 137-41.)

3

4      However, less than a month earlier, in an October 29, 2002 report,
5  Dr. Dobrin, an examining psychiatrist, diagnosed Plaintiff with:
6  attention deficit hyperactivity disorder, combined type, overfocused
7  subtype with decreased left and right inferior orbital prefrontal cortex
8  perfusion; mood disorder, not otherwise specified; generalized anxiety
9  disorder; cerebellar dysfunction; and rule-out social phobia.  (A.R.
10 108.)  Dr. Dobrin based his diagnoses upon clinical history, checklists,
11 a performance test, and findings from SPECT studies (tomographic brain
12 studies which provide brain maps).  (A.R. 108.)  Dr. Dobrin noted that
13 the most significant findings were the SPECT findings, which showed:
14 "[d]ecreased left and right inferior orbital prefrontal cortex perfusion
15 seen on both studies" and "[i]ncreased diffuse and focal thalamo-limbic
16 perfusion seen at rest."  (A.R. 107.)  He recommended that Plaintiff be
17 treated with various medications, including mood stabilizer medication,
18 such as an anti-convulsant, lithium, or atypical anti-psychotic
19 medication.  (A.R. 108.)

20

21     In an October 26, 2002 report, Dr. Jian Zhang, an examining
22 psychiatrist, diagnosed Plaintiff with psychosis secondary to general
23 medical conditions and mild mental retardation, and assessed Plaintiff
24 with a GAF of 35, which is indicative of major impairment.[4]  (A.R. 131.)

25

26     [4]   A GAF of 31-40 indicates "[s]ome impairment in reality testing
   or communication (e.g., speech is at times illogical, obscure, or
27 irrelevant) or major impairment in several areas, such as work or
   school, family relations, judgment, thinking, or mood (e.g., depressed
28 man avoids friends, neglects family, and is unable to work; child
   frequently beats up younger children, is defiant at home, and is failing

14

Dr. Zhang based his conclusions on a questionnaire completed by Plaintiff and a mental status examination. (A.R. 129-31.) Dr. Zhang found that Plaintiff has the following limitations: 1) "difficulty performing simple and repetitive tasks . . . [and] detailed or complex tasks due to his paranoid thoughts about people around him"; 2) "problems accepting instructions from supervisors and interacting with coworkers and the public due to his paranoid thoughts . . . [and] difficulty performing work activities on a consistent basis with or without any special or additional supervision"; 3) "difficulties maintaining regular attendance in the workplace or completing a normal workday or workweek without interruption from a psychiatric condition"; and 4) "tremendous difficulty dealing with the usual stress encountered in competitive work." (A.R. 131-32.)

A few months before that, in a May 18, 2002 report, Dr. Courtney, an examining psychologist, diagnosed Plaintiff with "parent child relational problem" and assessed Plaintiff with a GAF of 45, which also is indicative of serious symptoms.[5] (A.R. 127.) Dr. Courtney based his diagnoses on Plaintiff's statements, observations of Plaintiff's behavior, and intelligence and personality tests. (A.R. 124-26.) While Dr. Courtney did not specify precise limitations Plaintiff would have in the workplace, he noted that:

---

at school)." Diagnostic and Statistical Manual of Mental Disorders Text Revision, 34 (4th ed. 2000) ("DSM-IV-TR").

[5]   A GAF of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." DSM-IV-TR at 34.

15

> [Plaintiff] appears to be intellectually capable of his
> vocational goal, though he does have problems with his
> concentration.  This may make his vocational goal difficult
> for him and therefore, this needs to be addressed.  It seems
> likely that emotional and interpersonal issues are the basis
> of these problems, and as such, it is suggested that
> [Plaintiff] be involved in psychological counseling.

(A.R. 127.)

At the hearing, Dr. Malanchavuril, a non-examining expert, testified that he "agree[s] with [Plaintiff's] own analysis which is supported by the psychological evaluation in Exhibit 6F [Dr. Courtney's report], which is that he does have some intellectual academic difficulties partially dictated by the sensory handicaps." (A.R. 188.) Dr. Malancharuvil further testified that Plaintiff should be: restricted from jobs requiring hypervigilance or other people's safety (A.R. 189); limited to habituated, four or five-step tasks (A.R. 191); limited to an object-oriented environment without interpersonal interaction (A.R. 190); and restricted from frequent changes and limited to only occasional changes with warning in his work setting (A.R. 190-91).

A review of the medical evidence thus shows that the opinions regarding the level of Plaintiff's mental functioning -- such as the opinion of Dr. Malanchavuril, the medical expert (*i.e.*, Plaintiff has "some intellectual academic difficulties") and the diagnoses of the examining psychiatrists (*e.g.*, Dr. Zhang's opinion that Plaintiff has

"psychosis," "mild mental retardation" and a GAF of 35; Dr. Dobrin's opinion that Plaintiff has attention deficit hyperactivity disorder, mood disorder, generalized anxiety disorder, cerebellar dysfunction, and rule-out social phobia; and Dr. Courtney's opinion that Plaintiff has a GAF of 45) -- are at odds with each other.[6] These extremely divergent opinions in the medical record highlight the need to ensure that the record is fully developed, so that the mental residual functional capacity finding is based on complete, thorough, and accurate findings. *See, e.g.*, DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991)(quoting from Social Security Ruling 83-20)(the duty to develop the record in cases involving mental impairments is heightened, "'[b]ecause mentally ill persons may not be capable of protecting themselves from possible loss of benefits by furnishing necessary evidence.'").

Indeed, the ALJ's own description of the reports of the examining physicians suggests that he found these physicians' explanations regarding Plaintiff's limitations or the level of Plaintiff's intellectual functioning to be ambiguous and/or insufficient, which again would trigger his duty to develop the record by requesting that these doctors provide further explanation of their opinions. *See* 20 C.F.R. §§ 404.1512(e), 416.912(e)(requiring that an ALJ re-contact a medical source "when the report from [the] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on

---

[6]   Despite Dr. Malanchavuril's suggestion that his opinion is supported by Dr. Courtney's report, Dr. Malanchavuril's opinion that Plaintiff has relatively minimal mental limitations that would impact his ability to function in the workplace is inconsistent with Dr. Courtney's opinion that Plaintiff has a GAF of 45.

medically acceptable clinical and laboratory diagnostic techniques."). For instance, the ALJ specifically noted in his decision that Dr. Dobrin did not provide any GAF score and did not indicate any functional limitations and, instead, only "vaguely" noted that Plaintiff would qualify for work place accommodations under the Americans with Disabilities Act.  (A.R. 13.)

At present, the record contains no records from any physician from whom Plaintiff sought treatment for his mental health problems.  In view of the wide range of opinions regarding Plaintiff's mental capacity, such records could be of critical importance in this case.  Thus, after becoming aware of the likely existence of such records, the ALJ should have undertaken an effort to obtain all records from San Bernardino County pertaining to Plaintiff.  20 C.F.R. §§ 404.1512(e); 416.912(e)(duty to re-contact treating physician); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002)(requirement in 20 C.F.R. § 416.912(e) that the Commissioner re-contact treating sources is triggered where the information from the treating sources is inadequate to make a determination regarding disability).  While it would have been helpful had Plaintiff's counsel assisted in supplementing the record with these additional records, it is the ALJ's duty to develop the record, even when Plaintiff is represented by counsel.  Brown, 713 F.2d at 443.

Accordingly, for the reasons set forth above, the ALJ committed reversible error.

///

///

///

18

**C.     Remand Is Required.**

Where, as in this case, the record needs to be developed and there are errors in the ALJ's findings, remand is appropriate to allow the ALJ the opportunity to remedy those inadequacies and errors.  *See* McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989)(remand appropriate to remedy defects in the record); *see also* Diaz v. Secretary of Health, Ed. and Welfare, 613 F.2d 1194, 1200 (9th Cir. 1980).

**CONCLUSION**

Accordingly, for the reasons stated above, the denial of benefits is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.  Judgment shall be entered reversing the decision of the Commissioner, and remanding the matter for further administrative action consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for Plaintiff and for Defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 24, 2006

                                         /s/
                              MARGARET A. NAGLE
                       UNITED STATES MAGISTRATE JUDGE

19